Norman A. Stiller, J.
This is a proceeding to review a determination by the respondent, Assessor of the Town of Hamburg, that a portion of certain real property owned by the petitioner should be assessed for tax purposes and placed upon the 1974-1975 assessment roll of the town.
The petitioner seeks a judgment striking that assessment from the roll, or for alternative relief by way of review and reduction of the assessment which is also alleged to be excessive and disproportionate to the valuations placed upon all other real property in the Town of Hamburg.
Briefly, the petitioner alleges that the petitioner is a membership corporation and owner of a single parcel of land in the Town of Hamburg which is permanently used by it for exhibition grounds, a use which has apparently continued over 100 years; that such real property is exempt from taxation pursuant to section 450 of the Real Property Tax Law; and that the respondent has unlawfully placed a portion of the parcel on the assessment roll rather than continuing to list the entire parcel on that part of the roll which describes land exempt from taxation.
While the respondent has not answered, the allegations of *886 the petitioner are deemed to be denied by virtue of subdivision 1 of section 712 of the Real Property Tax Law.
The petitioner has moved for summary judgment in its favor upon the ground that there is no triable issue of fact and no defense to the claim that its real property is exempt from assessment, and that it is, therefore, entitled to judgment striking such assessment from the roll.
The statute upon which the claim to exemption is founded reads as follows:
"§ 450. Agricultural societies.
"Real property owned by an agricultural society and permanently used by it for exhibition grounds shall be exempt from taxation and exempt from special ad valorem levies and special assessments to the extent provided in section four hundred ninety of this chapter.”
It is not disputed that the petitioner, as its corporate name indicates, is an "agricultural society” and that it conducts each year a fair utilizing all or substantially all of the entire parcel of land which it acquired in 1869. This fair, which is said to have been held annually since acquisition of the property, now runs for nine days in the month of August, and in 1973 recorded a paid attendance in excess of 500,000 persons. The issue of taxability turns, however, upon the use to which the assessed portion of the parcel is devoted during the balance of each year.
In 1957, the petitioner leased a portion of its premises to a private profit-making corporation, the Buffalo Trotting Association, for a term of 20 years ending December 31, 1981, for the express and only purpose of permitting the lessee to conduct harness horse race meets at any time during each year excepting a period prior to, during and following the staging of the annual fair in the month of August. While the fair itself is continued for nine days only, certain periods of time are provided before and after the fair for preparation and cleanup, totalling all in all, approximately three weeks. The rents reserved to the petitioner are computed as a varying percentage of the total annual retained percentage and breaks received and held by the lessee upon its share of the pari-mutuel wagers placed by track patrons. Such rents are alleged to have amounted to $308,000 in the year 1973.
It is also alleged that the lessee, Buffalo Trotting Association, operated racing meetings during both the summer and *887 winter months of the years 1972 and 1973; that there were 150 days of racing in each of those years, with over 1,600 separate races involving a total wagering handle exceeding $38,000,000 annually.
It appears that the portion of petitioner’s lands assessed by the respondent constitutes approximately 51 acres out of the 215-acre total, and to this assessed portion respondent is said to have assigned a value of $1,074,350; "the balance of the property, listed as exempt, is valued at $692,619. The number, size and precise nature of the improvements upon the property, particularly those occupying the assessed portion, do not appear although the respondent alleges upon information and belief that "during the term of the lease, the grandstands were improved and winterized, and the clubhouse was completely remodeled by the Buffalo Trotting Association, at a cost far in excess of Three Million Dollars ($3,000,000.).”
What relationship the rents received by the society over the years bears to its total income and expense, does not appear, nor do the papers show the purposes to which such income is devoted.
The position taken by the society is simply that its ownership of the lands in question as an "agricultural society” upon which it conducts annually a nine-day fair or exhibition, entitles it to exemption from real property taxes pursuant to section 450 of the Real Property Tax Law, without regard to the leasing of a portion of the premises to a private profit-making corporation which apparently occupies the leased premises during the balance of each year in furtherance of its own corporate purpose, the conduct of harness horse races.
That is a too literal and mechanical reading of the statute relied upon, ignoring its purpose and relationship to other statutory exemptions. The answer should not be made to turn upon labored definitions of the phrase "permanently used * * * for exhibition grounds” (Real Property Tax Law, § 450), isolated from the historical context of the enactment, the public policy which it and other exemptions implement, and whether a given interpretation would produce in a particular factual situation a result consonant with the legislative intent evident or discovered.
The predecessor of section 450 was chapter 183 of the Laws of 1856, which reads: "§ 1. All lands now held, or which may hereafter be held, by any agricultural society in this state, *888 and permanently used for show grounds by any such society, shall be exempt from taxation during the time so used.”
The petitioner observed in its brief that: "In the early days, county fairs moved from community to community, and each year set up the necessary grounds and accommodations for the annual fair in a different location. Because of the expense involved in setting up the location for the fairs, it became evident that it would be preferable to have the fair each year at the same, permanent location. Additionally, if the County Fair had a permanent location the grounds would be available to other organizations or institutions in the general community having use for like facilities * * * This means that for the balance of the year it can be and is made available to other community and eleemosynary uses and constitutes an additional benefit to the community. The predecessor of Section 450 of the Real Property Tax Law was enacted in 1856 to accomplish this purpose. It provided an incentive for establishing permanent grounds for the county fairs by granting a tax exemption. It was entirely consistent with this legislative purpose to permit other uses during the time the exhibition grounds were not in use for the annual fairs.”
That seems a reasonable explanation for the use of the phrase "permanently used” although the word "regularly” might have been a better choice. In any event, it is true, as the petitioner points out, that exclusivity of use is not required year round though it is reasonable to expect that other uses would be consonant with the purposes of an agricultural society and with its use of its real property for "exhibition grounds.”
The certificate of incorporation of the Erie County Agricultural Society, filed in the office of the Secretary of State in 1856, provides: "The business and objects of said society shall be the promotion of the agricultural, horticultural, mechanical and manufacturing interests of said county.” In 1969 the certificate was amended to conform with certain requirements of the United States Internal Revenue Code so as to add the statement: "It shall be the purpose of the Erie County Agricultural Society to operate for the educational purposes as described in Section 501(c)3 of the Internal Revenue Code of 1954, or provisions amendatory thereto”.
While there is no claim here, as yet, that the conduct of harness horse racing for profit upon lands leased from the society promotes the agricultural, horticultural, mechanical, *889 manufacturing or educational purposes of the society, it cannot be said as a matter of law that the present factual showing obviates the conclusion that the leasing of a part of the premises for use as a race track is a use reasonably incidental to the purposes which the tax exemption is designed to promote. (Cf. People ex rel Watchtower Bible & Tract Soc. v Haring, 286 App Div 676 with People ex rel. Watchtower Bible & Tract Soc. v Haring, 8 NY2d 350.)
Certainly the relatively sparse recitations which appear in the moving papers respecting the occupancy of these premises by the petitioner and its lessee raise serious questions as to which use is primary and which is incidental. As has been mentioned, racing meetings were held on 150 days (nights) during 1972-1973; if this total number of days consisted of two meetings, as seems to be the case, the total number of days devoted to racing and preparation therefor would amount to 240 days, since the lease agreement provides that the tenant and owners of horses may occupy the leased premises for at least 45 days prior to each meeting. These periods may then total as much as two thirds of the year, possibly more. In addition, the lease provides that portions of the leased premises, such as office facilities and storage space, shall be occupied the year round by the lessee in pursuance of its corporate purposes, which obviously do not end at the conclusion of each racing meeting.
The reading of section 450, as contended by the petitioner, would ignore altogether any uses of its premises by others, however extensive, so long as the lands were used for "show grounds”, however brief that use might be. Theoretically, the exemption would follow if the fair or exhibition were held annually for one day and the premises leased to others for profit for 364 days.
In rejecting such a literal interpretation of this ancient statute two rules, one of substance and the other of construction, are pertinent. The first has been codified and now appears as section 300 of the Real Property Tax Law, and reads in part: "All real property within the state shall be subject to real property taxation, special ad valorem levies and special assessments unless exempt therefrom by law.”
The second, drawn from case law, requires that statutes of exemption be strictly construed against exemption and to be sustained the legislative intent must be clear and undoubted. It has been stated in the following language: "although we *890 ought not, perhaps, to give to the word 'exclusively’ an interpretation so literal as to prevent an occasional use of the relator’s property for some purpose other than one or more of those specified, yet the policy of the law is to construe statutes exempting property from taxation somewhat rigidly, and not to permit such exemption to be established by doubtful implication. In other words, the legislative intent to exempt any property from taxation can never be presumed, but must always be expressed in language so clear as to admit of no argument.” (People ex rel Delta Kappa Epsilon Soc. of Hamilton Coll, v Lawler, 74 App Div 553, 557, affd 179 NY 535.)
To be sure, the interpretation of an exemption statute "should not be so narrow and literal as to defeat its settled purpose” (People ex rel Watchtower Bible & Tract Soc. v Haring, 8 NY2d 350, 358, supra), but I do not find that the result contended for by the petitioner is within the clear and undoubted legislative intent in section 450.
As has been noted, exclusivity of use is not required by the section, but the interpretation advanced by the petitioner would place its lands in a uniquely advantageous category as compared to those owned by churches, hospitals, cemeteries, schools and colleges which generally are subject to taxation if leased for profit to third persons for purposes unrelated to those pursued by the owner (see, Real Property Tax Law, § 421 et seq.).
I would read section 450 as requiring that the use of the lands for "show grounds” be the primary or principal use, with other uses permitted if reasonably incidental thereto. In such a formulation, the leasing of a portion of the premises would not by itself be fatal to the claim to an exemption should it appear that such leasing is in fact secondary in terms of over-all use of the property for "show grounds” and in aid of that purpose.
Mention is made of the fact that the statute upon which the claim to exemption is founded has remained in the same language since its enactment in 1856, and this is said to be in the face of the allegedly well-known practice of agricultural societies, including the petitioner, in leasing out all or a portion of their lands to private, profit-making ventures. That seems to be far too speculative since there is no affirmative showing that the Legislature has considered any particular leasing arrangements, nor that it was aware as a body of any general practice, much less the nature and extent of such *891 uses, especially those of the petitioner. Legislative acquiescence ought not to be presumed where the factual bases upon which it is claimed to rest may be numerous and varied as may well be the case with respect to agricultural societies.
Whether or not an owner of property is entitled to an exemption from taxation pursuant to a particular statutory provision relating to use, must be resolved by consideration of the actual use to which the property is devoted during the period for which the exemption is claimed (see Matter of Prior Aviation Serv. v Board of Assessors of Town of Cheektowaga, 46 AD2d 219); that, I think is a factual question to be determined following an evidentiary hearing. Upon such a hearing all of the relevant facts should be developed, including at least the extent of the various uses of the entire parcel or its parts, the identity of those who use the lands and/or buildings and the periods and types of such usage, the value, nature and actual usage of the improvements erected on the land, the amounts of income realized by the petitioner upon its leasings and other uses, the relationship of these amounts to its total income, and the uses to which such income is devoted. Other factual data may well be suggested by the parties or the court conducting such hearing.
The motion for summary judgment is denied.